Filed 10/29/13  Precision Development v. Plyam CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| PRECISION DEVELOPMENT, LLC, | B236085 |
| Plaintiff, Cross-defendant and Appellant, | (Los Angeles County Super. Ct. No. BC384285) |
| v. | |
| YURI PLYAM et al., | |
| Defendants, Cross-complainants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Richard E. Rico, Judge.  Affirmed.

Latham & Watkins, Robert D. Crockett, Monica Klosterman and Justin Woolverton for Plaintiff, Cross-defendant and Appellant.

Mesisca, Riley & Kreitenberg, Dennis P. Riley and Rena E. Kreitenberg for Defendants, Cross-complainants and Appellants.

Yuri and Natalia Plyam (the Plyams) appeal from a judgment entered following a trial in which the jury by special verdict awarded Precision Development, LLC (Precision) $10.1 million in damages for breach of fiduciary duty. Precision filed suit against the Plyams alleging they breached their fiduciary duty by mismanaging, and diverting for their own personal use, $26.43 million invested by Clare and Sara Bronfman in a real estate venture. The jury also awarded $200,000 in punitive damages. The Plyams raise numerous errors that they argue individually or cumulatively mandate a new trial.

Precision also appeals from the judgment, contending the trial court erred by denying any equitable remedy under the unfair competition law (Bus. & Prof. Code, § 17200 et seq.) (hereafter, the UCL). We affirm the judgment.

FACTS[1]

1. *The First Amended Complaint*

In the first amended complaint (complaint), Precision claimed that from April 13, 2005 to December 20, 2007, the Bronfmans wired $26.3 million to a Precision account controlled by Yuri Plyam.[2] Using these funds, Yuri acquired property in Precision's name and partially developed 19 properties. Yuri also allegedly used Precision funds to acquire nine properties, in which title was held in his or his wife's name, or in the name of a business under his control, including a property that became his personal residence, known as the Roxbury property (Roxbury) in Beverly Hills. Rather than develop the Precision-acquired property as the parties intended, Yuri allegedly "diverted labor and materials" to develop properties held in his name or his wife's name. While in control of

---

[1]    We set out the facts giving rise to the underlying litigation and summarize the proceedings. Additional facts related to the issues raised by the parties are included in our legal discussion.

[2]    Where the same surname is shared by more than one person discussed in this opinion, for ease of reference we often use the first name. No disrespect is intended by this informality. (*Estate of Dito* (2011) 198 Cal.App.4th 791, 794, fn. 1.)

Precision, Yuri and his wife Natalia Plyam allegedly misused funds, and diverted Precision assets to develop their personal properties.

By the time of trial, the causes of action alleged against the Plyams were breach of fiduciary duty, conversion, constructive trust, and a UCL violation. A jury trial was conducted on the breach of fiduciary and conversion causes of action. Before the close of evidence, Precision dismissed the conversion cause of action. After the jury rendered its verdict, the trial court exercised its discretion and did not award any equitable remedy for a UCL violation or did not impose a constructive trust.

2. *The Creation and Management of Precision*[3]

The Plyams were introduced to Clare and Sara Bronfman through a mutual business contact. Yuri is a licensed commodities broker, and he operated his own commodities brokerage business called Castle Trading, Inc. (Castle Trading). One of Yuri's clients was Keith Raniere. Raniere is the conceptual founder of NXIVM, a company that specializes in human potential training. Nancy Salzman is the president of NXIVM. The Bronfmans also were associated with NXIVM. Raniere and Salzman acted as two of the Bronfmans' business advisers. Raniere introduced the Plyams to the Bronfmans after he learned about the Plyams' real estate venture. The Plyams traveled to Albany, New York to discuss the investment with the Bronfmans, Salzman, and Raniere.

The Plyams had ventured into real estate development, and they presented to the Bronfmans their concept of developing hillside residential properties in upscale areas of Los Angeles. Clare testified that she and her sister initially agreed to invest $20 million, and then later invested an additional $6.6 million to develop a condominium project.

---

[3] As Precision was the prevailing party at trial, we view the evidence, which was conflicting and vigorously contested, in a light most favorable to them. (*Greenwich S.F., LLC v. Wong* (2010) 190 Cal.App.4th 739, 747.) In a bifurcated trial, the trial court is bound by the jury's determination on common issues of fact. (*Hoopes v. Dolan* (2008) 168 Cal.App.4th 146, 155-158.) The breach of fiduciary duty and the UCL causes of action presented common factual issues. The court, therefore, was bound by the jury's determination that the Plyams breached their fiduciary duty. As discussed *post*, however, the challenge to the court's UCL judgment addresses a legal error, not a factual error.

3

In April 2005, the Bronfmans authorized Salzman to sign the formation agreement establishing Precision as a limited liability company (hereafter, 2005 agreement). Yuri was the initial manager, and Natalia testified that she signed the checks for Precision. The 2005 agreement stated that the property would be owned by Precision and title "shall be vested" in the company's name. Bank accounts were to be maintained in Precision's name, with regular audits on a quarterly basis.

Yuri testified the parties also had a verbal agreement regarding the real estate venture. The Bronfmans were funding the purchase and development of Precision properties, and the Plyams' contribution was their time and effort in making the venture a success. Yuri, the Bronfmans, and Salzman each would receive one-third of the profits when a property was sold. Precision was the holding company for the properties. Yuri used his own company, Castle Asset Management, LLC (CAM), sometimes referred to as Castle Development, to develop the Precision properties. The Plyams also used CAM to develop their own properties, including their Roxbury residence.

3. *Acquisition of Property with Precision Funds*

In 2005, the Plyams acquired several properties with Precision funds. In an e-mail to the Bronfmans' financial adviser, the Plyams stated: "The investments are all made in Precision Development, LLC name (ie [*sic*] titles to all the land is in that name). The expenses for architects, engineers etc. are also being paid from the LLC."

The following year, Precision acquired two additional properties, including the site in which the company intended to develop condominiums.

a. *Alonzo*

One of the first properties purchased with Precision funds was called "Alonzo," and contrary to the 2005 agreement, Yuri held title to Alonzo in his name as his sole and separate property. The Plyams, however, reported to the Bronfmans that Alonzo was a Precision property. In June 2007, the Plyams transferred title to "Yuri Plyam and Natalia Plyam, husband and wife, as joint tenants[.]" The Plyams encumbered Alonzo with a construction loan.

4

b.  *22560 Uhea Road*

Two of the five parcels known as the "Uhea" property, purchased in 2005 with Precision funds, were transferred by quitclaim deed from Precision to the Plyams in 2007.  The Plyams also encumbered 22560 Uhea Road with a construction loan.

c.  *9810 Wanda Park*

Title to 9810 Wanda Park, purchased with Precision funds, was transferred from Precision to the Plyams in 2007.  In construction loan applications, the Plyams indicated they held title to 9810 Wanda Park, and that the property would be their primary residence.  The loan application also listed additional properties that the Plyams owned, including Alonzo and 22560 Uhea Road.

Natalia testified that the bank transferred title to 9810 Wanda Park and 22560 Uhea Road into their names because the bank would not loan money to a limited liability company.

d.  *Knobhill*

There was conflicting testimony that the Plyams contributed a property identified as "Knobhill" to Precision's holdings.  On January 8, 2008, the day the Plyams surrendered control of Precision, the Plyams filed a quitclaim deed to transfer title to the Knobhill property from Castle Trading to Precision.  Ten days later, on January 18, 2008, the Plyams transferred Knobhill by quitclaim deed from Precision to the Yuri Plyam and Natalia Plyam Living Trust.

4.  *Development of Precision Properties*

From 2005 through 2007, CAM undertook the development of Precision Properties, along with development of the Plyams' properties.  Yuri represented to the Bronfmans' adviser that the Precision properties acquired before October 2005 would be completed by the end of 2006.  But none of the Precision properties was completed by 2006, and by December 2007, Precision had no more money.

In late December 2007, the Plyams asked the Bronfmans' financial advisers for an additional $400,000 to meet CAM's payroll.  The Plyams also were attempting to obtain

5

a $5 million bridge loan from other sources, listing Precision as the borrower. The Bronfmans introduced the Plyams to Frank Parlato, a possible lender.

The Bronfmans retained Parlato to guide them in their real estate investments. In early January 2008, Parlato and Jim Del Negro, among others, traveled to California to inspect the Precision properties. Parlato and Del Negro observed that some of the Precision properties were vacant, and others had foundations poured but were not framed. The three Precision properties that the Plyams held title in their names were almost completed or further developed than the other properties. By contrast, the Plyams' Roxbury residence was completed and occupied.

5. *Takeover of Precision*

The Bronfmans asked Parlato to take control of Precision. Represented by counsel, the Plyams signed an amendment to the 2005 agreement (2008 amendment). The 2008 amendment recognized that Yuri, the Bronfmans, and Salzman were members of Precision. The 2008 amendment also noted that each owned one-third of the company.[4]

With respect to the properties, the 2008 amendment identified the Precision properties in which title was held by either the Plyams or Precision and stated the Plyams would convey Alonzo, 9810 Wanda Park, and 22560 Uhea Road to Precision "on demand." As for Knobhill, the property would be transferred to Precision and would be the subject of a separate joint venture agreement.

The Plyams did not convey Alonzo, 9810 Wanda Park, and 22560 Uhea Road on demand. They had obtained construction loans in their name and needed Precision to pay off the loans before they could convey the properties to Precision. These Precision properties were lost to foreclosure because, as Del Negro explained, the loans were in the Plyams' name. The Plyams initially transferred Knobhill to Precision, but then they recorded a quitclaim deed transferring Knobhill to their family trust.

---

[4] Salzman later assigned her interest to the Bronfmans.

6

After commencing the lawsuit, the parties entered into a "Standstill Agreement." Under the terms of the Standstill Agreement, Parlato controlled and managed the Precision properties.

6. *Evidence of Precision's Damages*

The Plyams admittedly did not keep complete accounting records or maintain a general ledger while Yuri managed Precision. Precision's expert Barbara Gottlieb attempted to create a general ledger. Gottlieb explained that Precision paid out a net sum of approximately $13.6 million to purchase the properties. CAM spent an additional $4.7 million of Precision's funds developing Precision properties. Thus, Gottlieb concluded that approximately $18.3 million had been spent on Precision properties and development.

Gottlieb testified that $9.9 million of Precision funds were transferred to CAM and used by the Plyams. This gross sum was reduced to $8,484,029 by crediting the Plyams with $330,706 they appeared to have contributed to Precision, and a credit of $1,128,302 in loan proceeds. The Plyams spent approximately $1.16 million to purchase property titled in their name, which included Alonzo, 9810 Wanda Park, 22650 Uhea Road, and a Lake Arrowhead property. Construction costs totaled $6,756,277, and Gottlieb noted that there were disbursements totaling $1,532,667 without supporting evidence.

The Plyams challenged Gottlieb's calculation. Gottlieb did not account for approximately $3.2 million that Natalia testified the Plyams loaned to Precision. Natalia testified that she did not "have any writing as to loaning Precision money," but she kept track of loans and reimbursements in a personal notebook (Exhibit 816).[5] Exhibit 816 surfaced for the first time at trial.

Additionally, the Plyams believed that they should have been credited with their Knobhill contribution, and Gottlieb should not have included Alonzo, 9810 Wanda Park,

---

[5] One such entry stated: " 'Loan to CAM slash Precision 30,000. Offset $181,823.73 balance owed by Precision by work in Arrowhead by 125,199.48. Bring in Precision balance equal to as of 2/8/6 56,621 – 624.25.' "

and 22650 Uhea Road. Natalia testified, as of January 2008, Precision owed the Plyams $409,000.

Del Negro, the current president of Precision, testified that in January 2008, Precision and CAM had unpaid vendor invoices, and CAM employees had not been paid. Precision paid a total of $1.9 million to settle these debts.

7. *Special Verdict and Punitive Damages*

After an 18-day trial, the jury returned a special verdict, specifically finding breach of fiduciary duty, and awarded Precision $10.1 million in damages.[6] The jury also awarded Precision $200,000 in punitive damages.

8. *Equitable Causes of Action*

The trial court denied Precision's motion for entry of judgment on its causes of action for constructive trust and for a UCL violation. The trial court reasoned that the jury's award exceeded the amount of damages testified to by Precision's experts, and therefore the court exercised its discretion not to award equitable relief. As for imposing a constructive trust, the trial court concluded that there was insufficient evidence to award this equitable remedy.

9. *Motions for New Trial, JNOV, and Appeals*

The trial court denied the Plyams' motions for new trial[7] and judgment notwithstanding the verdict (JNOV).

---

[6]    The special verdict refers to Natalia as "Natasha." The question posed in the special verdict is: "Did Yuri Plyam or Nata[s]ha Plyam breach their fiduciary duties to Precision Development, LLC?"

[7]    The trial court ruled on two motions for new trial. After the jury reached its verdict, the Plyams moved for a new trial that was denied. Following the trial court's judgment on the equitable claims, the Plyams again moved for a new trial. The Plyams brought the motion because they believed their first motion was premature. Without ruling on that issue, the trial court adopted its ruling related to the first motion, and then addressed new issues raised in the second motion and the JNOV.

The Plyams appeal from the jury verdict awarding Precision $10.3 million in damages. Precision appeals from the court's determination that it is not entitled to equitable relief under the UCL.

DISCUSSION

*The Plyams' Appeal*

The Plyams' appeal sets forth numerous errors that they contend individually or cumulatively require a new trial. Specifically: (1) the trial court erred in denying their motion for new trial based on juror misconduct and insufficiency of the evidence; (2) the trial court committed reversible error by refusing the Plyams' special instruction, rejecting the Plyams' special verdict form, excluding evidence, and rendering an inconsistent verdict; (3) the jury verdict must be reversed because Precision was not entitled to a jury trial for its breach of fiduciary cause of action; (4) Precision's counsel engaged in prejudicial misconduct; (5) the cumulative effect of the trial court errors and juror misconduct requires a new trial; and (6) the trial court erred in granting summary adjudication of the Plyams' accounting cause of action asserted in their second amended cross-complaint. We discuss each in turn, concluding there is no reversible error.

1. *New Trial Motions*

The Plyams challenge the trial court's denial of their motions for new trial, arguing juror misconduct tainted the verdict and insufficient evidence supports the judgment. When reviewing an order denying a new trial motion on the grounds that the verdict is contrary to law or evidence (Code Civ. Proc., § 657, subds. (2), (5)), we recognize the trial court has broad discretion, and there is a strong presumption that it properly exercised that discretion. (*City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 871-872; *Garcia v. Rehrig Internat., Inc.* (2002) 99 Cal.App.4th 869, 874.)[8]

---

[8] In our review of an order denying a new trial, we review the entire record to make an independent determination as to whether the error was prejudicial. (*City of Los Angeles v. Decker, supra,* 18 Cal.3d at p. 872.)

a. *Juror Misconduct*

The Plyams contend they are entitled to a new trial because (1) one of the jurors was biased and withheld information during voir dire, (2) jurors discussed the evidence before deliberations, and (3) during deliberations another juror made comments outside the record. We conclude there was no prejudicial error.

In ruling on a request for a new trial arising from juror misconduct, the trial court undertakes a three-step process. (*Whitlock v. Foster Wheeler, LLC* (2008) 160 Cal.App.4th 149, 160.) First, it must determine whether the affidavits supporting the motion are admissible. (Evid. Code, § 1150; *People v. Dorsey* (1995) 34 Cal.App.4th 694, 703.) Second, if the evidence is admissible, the trial court must determine whether the moving party has presented facts to establish misconduct. (*People v. Dorsey*, at p. 703; see also *Donovan v. Poway Unified School Dist.* (2008) 167 Cal.App.4th 567, 625.) Third, once misconduct is established, the trial court must determine whether the misconduct is prejudicial. (*Whitlock v. Foster Wheeler, LLC*, at p. 160.) A presumption of prejudice arises. (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 416-417.) The presumption may be rebutted "by an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party resulting from the misconduct. [Citations.]" (*Id.* at p. 417, fn. omitted.) Thus, we independently review the trial court's determination of whether the Plyams were prejudiced by the misconduct. (*Whitlock v. Foster Wheeler, LLC*, at p. 158.) We note, however, juror misconduct is an area in which broad discretion is accorded to the trial judge. (*Id.* at p. 159.)

(1) *Motion*

(a) *Concealment and Bias*

Jurors Homayoun Shirkhani and Amanda Traxler submitted declarations relating incidents in which Juror Ruben Salcedo commented on the Plyams' Russian ancestry and their accents. After trial, the Plyams' counsel also discovered that Salcedo did not disclose during voir dire his experiences with Russians, which included litigation arising

from an auto accident in which counsel stated that two Russians had sued Salcedo for damages.

(b) *Discussions Before Deliberations*

Jurors Shirkhani and Traxler stated that the jurors discussed the case before deliberations. Salcedo was the only juror specifically identified in their declarations. Traxler overheard Salcedo "indicate[] that he would not want to do business with Mr. Plyam," "he wondered how the Plyams would be affected if they lost the case," and "he believed it would not affect them financially because they had plenty of money and that the Plyams probably had a lot of other business deals and other sources of income." According to Traxler, in response to Salcedo's comments, an unidentified juror stated: "the Plyams had probably taken money from others and had bilked other people like the Bronfmans." Shirkhani reported that Salcedo made the following statements to her: "I don't like the way Mr. Plyam looks at me," and "the Plyams had helped themselves to other people's money." Shirkhani overheard another juror comment that "the Plyams were rich and should have paid the workers."

(c) *Conduct During Deliberations*

Jurors Shirkhani and Traxler also report that Salcedo made comments during deliberations to the Spanish speaking jurors without translating his comments to the non-Spanish speaking jurors. Another juror, who was a paralegal, commented "in her experience the number of documents produced by the Plyams was not significant as normally many more documents are produced." And while deliberating on whether to award punitive damages, both Shirkhani and Traxler report that Salcedo thought the jury should award $12 million, even though Precision's attorney asked for $4 million.

(2) *Opposition*

In opposition, Precision submitted Salcedo's declaration, along with two other jurors' declarations. Salcedo stated that when asked during voir dire whether he had ever been involved as a defendant or plaintiff in litigation, he "did not think at the time that my fender-bender in 2004 was a real lawsuit and that I had been sued because it had settled and it was handled entirely by an insurance company." Salcedo also noted that the

11

people in the other car were Armenian, and that he "had no prejudice against Russians." Salcedo stated that before the case was presented to the jury for deliberations, he "did not make negative comments about the Plyams. I did my best to keep an open mind about the case and evidence until it came time to deliberate."

Jurors Xuan Diep and Carolina Interiano stated that during trial and before deliberations they did not remember or recall Salcedo making negative statements about the Plyams or Russians. Diep reported: "On occasion the jurors might have made a few comments about the witnesses they were watching, but I didn't hear anything along the lines of somebody prejudging the case and saying they didn't want to hear any more evidence."

During deliberations, Salcedo admitted to speaking Spanish, but his comments were not about the evidence. Juror Interiano speaks Spanish and stated after deliberations began, "I don't recall Mr. Salcedo commented upon the evidence in Spanish."

### (3) *Analysis*

#### (a) *Admissibility of Declarations*

Without supporting argument, the Plyams cite Evidence Code section 1150 to contend the declarations that Precision submitted are inadmissible. (See *Barboni v. Tuomi* (2012) 210 Cal.App.4th 340, 349.) The Plyams did not contest the admissibility of the declarations in the trial court and have forfeited this argument. (*Premier Medical Management Systems, Inc. v. California Ins. Guarantee Assn.* (2008) 163 Cal.App.4th 550, 564.)

#### (b) *Evidence of Misconduct*

The Plyams next contend that they have met their burden of establishing juror misconduct. (*Donovan v. Poway Unified School Dist.*, *supra*, 167 Cal.App.4th at p. 625.) On appeal, we must accept the trial court's "credibility determinations and findings on questions of historical fact if supported by substantial evidence." (*Barboni v. Tuomi, supra,* 210 Cal.App.4th at pp. 345, 349.) The trial court concluded that misconduct had occurred based upon Salcedo's comments before deliberations, and presumably based

12

upon the possibility that the paralegal juror's comments constituted matters outside the record.

As for the remaining allegations of juror misconduct, we accept the trial court's determination because it is supported by substantial evidence. The trial court credited Salcedo's declarations, and apparently found Jurors Shirkhani's and Traxler's declarations insufficient to establish other incidents of juror misconduct.

### (c) *No Prejudicial Error*

The Plyams disagree with the trial court's conclusion that Salcedo's comments and the paralegal's comment were not prejudicial. They argue that Salcedo's comments indicate he prejudged the case, and the paralegal's comment affirmed Precision's theory that the Plyams refused to produce documents because they were trying to hide their wrongdoing.[9] As noted, we review the entire record, including the evidence, and make an independent determination as to whether the misconduct was prejudicial. (*Sherman v. Kinetic Concepts, Inc.* (1998) 67 Cal.App.4th 1152, 1160-1161.)

Salcedo's misconduct did not infect the trial with prejudicial matter relating to the Plyams or their case itself, as they appeared to be isolated comments. These comments were not brought to the trial court's attention during trial. Although Salcedo does not directly deny making comments, Jurors Shirkhani and Traxler do not state that Salcedo

---

[9] The Plyams' opening brief inaccurately paraphrases Juror Traxler's affidavit (without citation) to stress their point regarding juror misconduct. The opening brief states: "The paralegal expressed the opinion that due to the small number of documents produced by Appellants, it was likely Appellants had intentionally withheld or destroyed documents in the case as contended by Precision." Juror Traxler said no such thing. Traxler's declaration actually states: "During the trial, one of the issues was the amount of documents produced by the Plyams. During the deliberations this issue of document production came up and one of the jurors, who was a paralegal, commented that in her experience the number of documents produced by the Plyams was not significant as normally many more documents are produced."

13

ignored further evidence or the defense case, or that they thought he disregarded argument and instructions. They also do not state that Salcedo declined to deliberate.[10]

Assuming the paralegal's comment related to experiences outside the evidence, rather than the juror's view of the evidence, this comment was consistent with the evidence presented at trial. The Plyams contend this comment related to a hotly contested issue of the Plyams' recordkeeping. The hotly contested issue was not the amount of documents or records, but the accuracy of the Plyams' recordkeeping. Unlike the juror misconduct at issue in *Whitlock v. Foster Wheeler, LLC*, *supra*, 160 Cal.App.4th 149, in which the juror interjected his experience to contradict evidence presented at trial, here the Plyams told the jury that Natalia either did not produce documents, including Exhibit 816, or she did not have documents to produce to show that the Plyams lent money to Precision.

Upon our review of the record, as discussed *post*, sufficient evidence presented at trial supported the jury verdict. Salcedo's comments at some point during the trial before the close of evidence, and the paralegal's comment during deliberations do not establish the probability of actual prejudice. Thus, there was no prejudicial error.

b. *Sufficiency of the Evidence Supports the Jury's Verdict*

The Plyams challenge the evidence that supported the jury's verdict.[11] (Code Civ. Proc., § 657, subd. (6).) "A new trial shall not be granted upon the ground of insufficiency of the evidence to justify the verdict or other decision, nor upon the ground of excessive or inadequate damages, unless after weighing the evidence the court is

---

[10] Contrary to the Plyams' opening brief, Traxler's declaration does not state that she was persuaded by Salcedo's comments either before the case was submitted to the jury or during deliberations. No evidence is admissible to show the effect of such statements upon a juror in influencing him or her to assent to or dissent from the verdict. (Evid. Code, § 1150, subd. (a).)

[11] On appeal from the denial of a JNOV motion, we determine whether there is any substantial evidence, contradicted or uncontradicted, supporting the jury's conclusion. If there is, we must affirm. (*Shapiro v. Prudential Property & Casualty Co.* (1997) 52 Cal.App.4th 722, 730.)

14

convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision." (Code Civ. Proc., § 657, subd. (7).) Under the substantial evidence rule, we determine whether there is any substantial evidence, contradicted or not, that will support the conclusion reached by the jury. (*Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 737-738.) A party who challenges the sufficiency to support a finding must summarize the evidence on that point, both favorable and unfavorable, and show how and why it is insufficient. (*Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409.) The Plyams have failed to adhere to this appellate practice.

(1) *Breach of Fiduciary Duty*

The Plyams argue that because Precision's expert accounted for all of the Bronfmans' investment, there was no breach of the fiduciary duties of loyalty or care.[12]

(a) *Breach of Duty of Loyalty*

The Plyams maintain that once all of the Bronfmans' money was accounted for, Precision's case turned on the Plyams' holding title to three Precision properties. But, the Plyams argue that Precision did not establish they intended to steal these properties, and thus they did not breach the trustee's duty of loyalty to "hold as trustee for it any property." (Corp. Code, § 16404, subd. (b)(1).)[13]

The Plyams ignore the evidence that although the Bronfmans' investment was accounted for, they transferred funds out of the Precision account into CAM, their own wholly owned company, and used those funds to develop their own properties. They also

---

[12] "The elements of a cause of action for breach of fiduciary duty are: (1) the existence of a fiduciary duty; (2) a breach of fiduciary duty; and (3) resulting damage." (*Pellegrini v. Weiss* (2008) 165 Cal.App.4th 515, 524.) In their opening brief, the Plyams do not contest the jury's finding on the first element. Issues raised for the first time in reply related to Natalia's fiduciary duty are deemed waived. (*Julian v. Hartford Underwriters Ins. Co.* (2005) 35 Cal.4th 747, 761 & fn. 4.)

[13] Corporations Code section 17153 states: "The fiduciary duties a manager owes to the limited liability company and to its members are those of a partner to a partnership and to the partners of the partnership."

15

claimed on loan applications they owned certain Precision properties. While the 2008 amendment permitted the Plyams to hold title, this occurred after discovery of the Plyams' wrongdoing, while Precision attempted to assess and salvage the Bronfmans' investment.

The Plyams had explanations for transferring Precision funds to CAM and for holding title to Precision properties, which the jury could have reasonably believed. But, the jury apparently rejected these explanations. The question we face is whether a reasonable jury could have found that the Plyams breached their fiduciary duty of loyalty. We conclude there was sufficient evidence from which a reasonable jury could have made such a finding.

(b) *Breach of Duty of Care*

Having concluded there is sufficient evidence to establish a breach of the duty of loyalty, we need not dwell on the Plyams' argument that there was no evidence to establish a breach of the duty of care. To establish a breach of the duty of care, Precision had to prove grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of the law. (Corp. Code, § 16404, subd. (c).) It is the Plyams' contention that no such evidence exists because a fiduciary does not breach a duty of care by transferring funds when the fiduciary is owed money. (Corp. Code, § 16404, subd. (f).) Again, this is the Plyams' view of the evidence that they advanced/loaned $3.2 million to the venture. It is true that the Plyams presented Exhibit 816, in which Natalia documented loans they made to Precision while waiting for the Bronfmans' funds. The Plyams, however, overlook the abundant evidence presented by Gottlieb in which she accounted for $8.4 million in Precision funds spent by the Plyams on their own properties. This was sufficient evidence upon which the jury could have concluded that the Plyams breached their duty of care. Thus, the trial court did not abuse its discretion in denying the motion for new trial based on the Plyams' challenge that the evidence did not support the jury's verdict.

16

(2) *Excessive Damages*

The Plyams contend that there is no evidentiary support for the $10.1 million in damages awarded to Precision, and the award includes money owed to CAM.[14]  The Plyams take a narrow view of the evidence presented to the jury.

Precision's expert testified that the Plyams used approximately $8.4 million of Precision's funds (transferred to CAM), and Precision spent another $1.9 million to retire debts to vendors and employees after taking over from the Plyams.[15]  The jury heard that Precision properties had not been developed and were in disarray and must have concluded that these funds were not spent on Precision properties.

The Plyams offered an alternate calculation to the jury to discredit the $8.4 million figure.  Using Gottlieb's calculation, and eliminating Alonzo, 9810 Wanda Park, and 22650 Uhea Road, at most they spent $1.1 million of Precision funds on their own properties, of which approximately $330,000 should be deducted as their contribution to Precision.  Moreover, the Plyams told the jury that holding title to the Precision properties did not harm Precision, and Precision lost the properties to foreclosure.  The jury rejected the Plyams' calculations and justifications.  There was sufficient, albeit conflicting evidence, to support the damages award.  The trial court reached the same conclusion in denying the motion for a new trial.[16]

---

[14]     The Plyams repeatedly argue that Precision's funds transferred to CAM became CAM's funds, and any diversion of these funds harmed CAM, not Precision.  Yuri, as manager of Precision, opted to use CAM, his wholly owned company, to develop Precision properties.  In doing so, the Plyams transferred Precision's assets to Yuri's company.

[15]     Although the Plyams now challenge the admissibility of this evidence, the trial court permitted this inquiry, and the Plyams' counsel attempted during cross-examination to impeach Del Negro's credibility.

[16]     The Plyams cite to the court's comments during oral argument on the motion as further support that the damages were excessive.  A judge's comments during oral argument may never be used to impeach the final order.  (*Jespersen v. Zubiate-Beauchamp* (2003) 114 Cal.App.4th 624, 633.)  Here is why.  During oral argument, the trial court stated that it intended to focus on the damages award because "where I have

(3) *Punitive Damages*

Punitive damages may be awarded only when the jury finds oppression, fraud, or malice by clear and convincing evidence. (Civ. Code, § 3294, subd. (a).)  We review a challenge to the sufficiency of evidence to support punitive damages by considering whether the record contains substantial evidence to support a determination by clear and convincing evidence.  (*Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 891.)  The Plyams had the burden, however, to not only set forth the facts in their favor, but all material evidence on this point.  Their failure to do so here forfeits the argument on appeal.  (*Stewart v. Union Carbide Corp.* (2010) 190 Cal.App.4th 23, 34.)

Addressing the merits, the jury heard the Plyams' version of events, recited in their briefs, but the evidence also supports a different version.  The jury believed that the Plyams' used Precision funds for their benefit, and their conduct was more than negligent or careless, and instead amounted to intentionally misleading the Bronfmans.  As for the amount awarded, the jury heard that the Plyams withdrew from their bank account $200,000 to liquidate to cash.  Our analysis of the record convinces us that there is sufficient evidence based on the heightened burden of Civil Code section 3294, subdivision (a), to support the jury's punitive damages award of $200,000.

2.  *Trial Court Errors*

a. *Refusal of Proposed Special Instruction Regarding Damages*

The Plyams contend that the trial court committed reversible error by failing to give their proposed instruction regarding damages.  Their instruction read:  " 'Plaintiffs, if they prove their claim for breach of fiduciary duty, are only entitled to any monies that they have proven were wrongfully taken from Precision.' "  Instead, the trial court

the problem in the case is the amount of damages."  But, during the same argument, the trial court stated the Plyams had an obligation to keep accurate records, a question lingered as to whether Exhibit 816 was created after the fact, and "the jurors could have found that, quite frankly, Ms. Plyam was willfully false and disregard everything she had to say about this case."

18

instructed the jury on the breach of fiduciary claim that to find for Precision, Precision must prove the Plyams' conduct was a "substantial factor in causing Precision Development's harm." The Plyams argue that their instruction should have been given because, unlike the given instruction, their instruction imposed limits by requiring the jury to look only at Precision's loss, and not CAM's loss.

"A court may refuse a proposed instruction if other instructions given adequately cover the legal point." (*Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 685.) The refusal of a proper instruction is prejudicial only if " 'it seems probable' that the error 'prejudicially affected the verdict.' [Citations.]" (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580.) "[W]hen deciding whether an error of instructional omission was prejudicial, the court must also evaluate (1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled. [Fn. omitted.]" (*Id.* at pp. 580-581.)

The Plyams' arguments do not persuade us that the jury's verdict must be reversed because they have not shown that the trial court's instructions did not adequately convey to the jury the law or that the jury was misled. The trial court instructed the jury with CACI No. 4101 (failure to use reasonable care), and an instruction patterned after Corporations Code section 16404 addressing the fiduciary duty of loyalty and duty of care, along with a damages instruction that was legally correct and specifically referred to Precision. These instructions correctly stated the law and clearly indicated to the jury that the issue in this case was Precision's damages arising from the Plyams' breach of fiduciary duty. (See *Michelson v. Hamada* (1994) 29 Cal.App.4th 1566, 1582.) The Plyams' arguments relate to the amount of damages awarded and are better suited for the jury. Upon our review of the record, in the light most favorable to the Plyams, there was no prejudicial error.

b. *Special Verdict Form Errors*

The Plyams also address deficiencies in the special verdict form that they maintain constitute prejudicial error. The Plyams contend the trial court erred in rejecting their special verdict form that asked the jury to separately determine the questions of whether

19

the Plyams breached their fiduciary duty of loyalty and/or their fiduciary duty of care. Instead, the jury was asked to determine the more general question of whether the Plyams' had breached their fiduciary duties owed to Precision. The Plyams also contend the question in the special verdict form addressing punitive damages was too general because it did not ask the jury to determine whether Yuri or Natalia, or both, acted with malice, oppression, or fraud.[17] We review the special verdict form de novo. (*Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 325.)

"The special verdict must present the conclusions of fact as established by the evidence . . . ." (Code Civ. Proc., § 624.) "A special verdict is 'fatally defective' if it does not allow the jury to resolve every controverted issue." (*Saxena v. Goffney*, *supra*, 159 Cal.App.4th at p. 325.) A special verdict form is not defective, however, merely because it does not ask the jury to make separate findings on each element of a given cause of action. (See *Babcock v. Omansky* (1973) 31 Cal.App.3d 625, 630-631 [jury instructed on elements of fraud, and court rejected cumbersome interrogatories related to several elements of fraud claim in special verdict], disapproved on other grounds in *Canal–Randolph Anaheim, Inc. v. Wilkoski* (1978) 78 Cal.App.3d 477, 485-486, 496.)

The trial court correctly noted the issue before the jury was whether the Plyams breached their fiduciary duties, and whether they breached the duty of loyalty or the duty of care was encompassed in the jury's finding. If the Plyams' conduct breached either duty, Precision was still entitled to the relief granted. The jury also was instructed on both the fiduciary duty of loyalty and duty of care. "Absent some contrary indication in the record, we presume the jury follow[ed] its instructions [citations] 'and that its verdict reflects the legal limitations those instructions imposed' [citation]." (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 803-804.) In view of the court's instructions to the jury, we are not persuaded by the Plyams' contention the wording in the special verdict regarding a breach of their fiduciary duties, was prejudicial to them.

---

[17] The special verdict stated: "Has Precision Development, LLC proven by clear and convincing evidence that Yuri or Natasha Plyam acted with malice, oppression, or fraud?"

20

As for the question in the special verdict addressing punitive damages, the Plyams' proposed special verdict form asked the jury to make special findings with respect to Yuri and Natalia, but the Plyams raised no objection on this point when the trial court decided to use Precision's special verdict. Citing *Amerigraphics, Inc. v. Mercury Casualty Co.* (2010) 182 Cal.App.4th 1538, 1557, the Plyams argue they preserved this issue on appeal by raising it in their JNOV and second motion for a new trial. Although Precision was responsible for having a verdict form submitted to the jury on its case (*Ibid.*), given the Plyams' involvement in this process, and their insistence that the special verdict specifically address Yuri and Natalia, it was incumbent upon them to raise this point before the jury began deliberation. Moreover, " ' "[i]f the verdict is ambiguous the party adversely affected should request a more formal and certain verdict. Then, if the trial judge has any doubts on the subject, he [or she] may send the jury out, under proper instructions, to correct the informal or insufficient verdict." [Citations.]' [Citation.]" (*Behr v. Redmond* (2011) 193 Cal.App.4th 517, 529-530.) At no time before the jury was dismissed did the Plyams' counsel raise this issue. Given the circumstances presented here, the Plyams have not demonstrated prejudicial error.

c. *Exclusion of Evidence*

The Plyams contend the trial court erred by excluding from evidence two agreements that Parlato had with the Bronfmans and a loan agreement the Bronfmans entered into with Raniere. In reviewing a "trial court's evidentiary ruling for abuse of discretion [citation] . . . we review 'the ruling, not the rationale.' [Citation.]" (*Park v. First American Title Co.* (2011) 201 Cal.App.4th 1418, 1427.) "If evidence is excluded on an improper objection but the evidence excluded is subject to objection on a different ground, it does not matter that the reason advanced by counsel or relied upon by the court was wrong. [Citations.] If the exclusion is proper upon any theory of law applicable to the instant case, the exclusion must be sustained regardless of the particular considerations which may have motivated the trial court to its decision. [Citations.]" (*Philip Chang & Sons Associates v. La Casa Novato* (1986) 177 Cal.App.3d 159, 173.)

The erroneous exclusion of evidence is not reversible error unless it caused a miscarriage of justice. (Evid. Code, § 354.)

The exclusion of two agreements between Parlato and the Bronfmans did not result in a miscarriage of justice. The Plyams' counsel asked Clare about the agreements, and she responded: "There was an agreement making him CEO. There was a separate power of attorney [admitted into evidence]. There was a loan agreement . . . between Mr. Parlato and my sister and myself." Although not admitted into evidence, counsel asked Clare about the content of these agreements. The elicited testimony permitted the Plyams' counsel to use the agreements to advance their case. Thus, any error in excluding these documents was harmless.

The Raniere loan agreement was properly excluded under Evidence Code section 352. If admitted into evidence, this would have led to a line of questioning that was unrelated to Precision's loss and instead focused on Raniere's losses in the commodities market, the Bronfmans' relationship with Raniere, and Raniere's purported motives to get "the Bronfmans to turn on the Plyams." The trial court's evidentiary ruling excluding this document did not constitute an abuse of discretion, and therefore does not constitute reversible error.

### d. *Consistency of the Verdict*

The Plyams contend the trial court's decision not to award equitable relief on the UCL cause of action is inconsistent with the jury's verdict. The Plyams essentially argue the court's conclusion that the Plyams transferred 9810 Wanda Park and 22650 Uhea Road to their name to obtain construction loans was inconsistent with the jury's verdict that the Plyams breached their fiduciary duty by holding title to Precision properties. We cannot assume the jury's verdict was based only on holding title.

The trial court was bound by the jury's determination that the Plyams breached their fiduciary duty when determining factual issues common to the legal and equitable issues. (*Hoopes v. Dolan*, *supra*, 168 Cal.App.4th 155-158.) The statement of decision on the UCL cause of action is not inconsistent with the jury's verdict. The jury concluded that the Plyams breached their fiduciary duty based upon the theory at trial that

the Plyams diverted Precision funds to develop their own properties.  There is no reversible error.

3.  *Right to Jury Trial on Breach of Fiduciary Cause of Action*

The Plyams contend that after Precision dismissed its conversion claim, the jury should not have decided Precision's cause of action for breach of fiduciary duty because it is an equitable claim, not a legal one.  The Plyams have forfeited this argument.  (*Taylor v. Union Pac. R.R. Corp*. (1976) 16 Cal.3d 893, 900 [in reverse situation, court held " 'a party cannot without objection try his case before a court without a jury, lose it and then complain that it was not tried by jury. . . .  'Defendants cannot play "Heads I win.  Tails you lose" with the trial court.' "].)

After the conversion cause of action was dismissed, the Plyams did not raise the objection they now advance on appeal.  They made no request that the breach of fiduciary cause of action should be decided along with the other equitable causes of action.  Instead, the Plyams proposed and argued jury instructions and submitted a special verdict form.  The Plyams cannot try the case to the jury, lose it, and then complain it should not have been tried by jury.

4.  *Attorney Misconduct*

The Plyams assert that Precision's counsel engaged in misconduct during his opening statement and closing argument when he violated court orders, and during trial when he impugned opposing counsel's credibility and made unwarranted attacks on  the Plyams.  In order to justify a new trial, the Plyams must demonstrate that the misconduct was prejudicial.  (*Cassim v. Allstate Ins. Co*., *supra*, 33 Cal.4th at pp. 800-802.)  We must determine whether prejudice actually occurred in light of the entire record.  (*Id*. at pp. 801-802.)

a.  *Opening Statement and Closing Argument*

With respect to opening statement and closing argument, the Plyams forfeited all but two of these contentions because they failed to object and, when the objection was sustained, did not ask for a curative admonition or seek a mistrial.  (*Cassim v. Allstate*

23

*Ins. Co.*, *supra*, 33 Cal.4th at pp. 794-795; *Garcia v. ConMed Corp.* (2012) 204 Cal.App.4th 144, 148.)  We address the remaining two contentions.

First, at the outset of trial, Precision moved in limine for judicial notice of a trial court order granting its temporary restraining order (TRO).  During argument on the motion, Precision's counsel represented he would not "argue the TRO for its own sake." When Precision's counsel mentioned the order during opening statements, the Plyams objected, and out of the presence of the jury they moved for a mistrial.  The trial court denied the motion.  Thereafter, the Plyams cite to three instances in which Precision's counsel referred to the court order.  The trial court, however, sustained the Plyams' objections, and the Plyams did not seek a curative admonition.

Second, during opening statements, Precision's counsel referred to information obtained during punitive damages discovery that was the subject of a court order. Precision's counsel told the jury that the Plyams had a "safe with cash" at their personal residence.  At a sidebar, the Plyams objected to the use of this information.  The court admonished counsel and the issue never came up again during the liability phase of the trial.

### b. *Other Misconduct*

The Plyams contend that Precision's counsel made unwarranted attacks on Natalia.  Specifically, Precision's counsel repeatedly asked Natalia about a $6 million secret account that held Precision's funds.  Precision's counsel also posed the following question related to Exhibit 816:   "Did your lawyer participate with you in the creation of this document [Exhibit 816]?"

With respect to the Plyams' counsel, he was accused in front of the jury of "stalling" to obtain a mistrial, writing a threatening letter, and, as noted, participating in the fabrication of Exhibit 816.

24

c. *No Prejudicial Error*

Of the numerous asserted instances of attorney misconduct,[18] only the accusation in the question to Natalia related to her counsel's participation in the creation of Exhibit 816 arguably constituted misconduct. Upon our review of the evidence, the instructions delivered to the jury, and the entirety of Precision's counsel's comments and argument, we conclude that even if characterized as misconduct, it was harmless. The question was one of many questions posed to Natalia in a vigorous examination into the origin of Exhibit 816. Exhibit 816 constituted only one exhibit entered into evidence during the lengthy trial, and the exhibit was offered in the Plyams' defense to show loans to Precision and reimbursements from Precision funds. While counsel focused on Exhibit 816 in his closing argument, he is given wide latitude to discuss the case. (*Cassim v. Allstate Ins. Co.*, *supra*, 33 Cal.4th at pp. 795-796.) We conclude that it is not reasonably probable the Plyams would have obtained a more favorable result absent the misconduct.

5. *Cumulative Error Doctrine*

Finally, the Plyams argue that even if no single error standing alone were sufficient for a reversal, the cumulative effect of the errors at trial would require reversal. The cumulative error doctrine applies when "the cumulative effect of the errors . . . make[s] it 'reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error[s].' [Citation.]" (*Johnson v. Tosco Corp.* (1991) 1 Cal.App.4th 123, 141.)

To the extent the trial court made any errors, those errors were not prejudicial, as we have discussed. There is no reasonable probability that a result more favorable to the Plyams would have been reached in the absence of these errors.

---

[18] We employ the term "misconduct," because it is commonly used to describe this type of error. (*Cassim v. Allstate Ins. Co.*, *supra*, 33 Cal.4th at p. 800, fn. 5.)

6. *Summary Adjudication of the Plyams' Cause of Action Seeking an Accounting*

The Plyams contend that the trial court erred as a matter of law in granting summary adjudication of their cause of action seeking an accounting. The trial court granted the motion because "[t]he Cross-Complainants failed to meet their burden of argument as to why this remedial theory should not be dismissed." By failing to address Precision's arguments on this issue in the opposition to the motion for summary adjudication, the Plyams waived any challenge to the court's ruling on appeal. (*Waisbren v. Peppercorn Productions, Inc.* (1995) 41 Cal.App.4th 246, 263.)

On appeal, the Plyams argue that as a matter of law, under Corporations Code section 16405[19] they may pursue a cause of action for an accounting against Precision. "[T]he nature of a cause of action in accounting is unique in that it is a means of discovery. An accounting is a 'species of disclosure, predicated upon the plaintiff's legal inability to determine how much money, if any, is due.' [Citation.]" (*Teselle v. McLoughlin* (2009) 173 Cal.App.4th 156, 180.) Yuri was in a position to determine the amount of money he and Natalia loaned to Precision. Natalia kept Precision books, and under the 2005 agreement, Yuri had access to the books and records and was entitled to receive a quarterly audit statement or a copy of the bank statements. The undisputed evidence establishes an essential element of this cause of action could not be established. (See 5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, §§ 820 to 821, p. 238.) Upon our de novo review (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460), the accounting cause of action was properly adjudicated before trial.

---

**19** Corporations Code section 16405, subdivision (b) provides: "A partner may maintain an action against the partnership or another partner for legal or equitable relief, with or without an accounting as to partnership business, to do any of the following: [¶] . . . [¶] (2) Enforce the partner's rights under this chapter, including all of the following: [¶] (A) The partner's rights under Section 16401, 16403, or 16404." (Corp. Code, § 16405, subd. (b)(2)(A).)

26

*Precision's Appeal*

Precision contends the trial court's decision to deny relief under the UCL rests on an error of law. The company challenges the trial court's legal analysis that the equitable relief it sought was cumulative. The court stated in its decision: "Plaintiff does not dispute that it has already been awarded a jury verdict that exceeds the amount of damages testified to by Plaintiff's expert, and Plaintiff has not cited to any authority authorizing a remedy under the UCL as an alternative to damages that have already been awarded." Precision argues that UCL remedies are expressly cumulative and are not to be denied on the ground there are alternative remedies under a specific statute unless that statute provides an exclusive remedy. (*Blue Cross of California, Inc. v. Superior Court* (2009) 180 Cal.App.4th 1237, 1249; see also Bus. & Prof. Code, § 17205.) We independently review questions of law. (See *Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799.)

The UCL remedy of restitution "means the return of money to those persons from whom it was taken or who had an ownership interest in it." (*Madrid v. Perot Systems Corp.* (2005) 130 Cal.App.4th 440, 455, citing *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1144-1145.) The jury's damages award to Precision constituted a return of Precision funds used to develop the Plyams' properties.

In addition to restitution, the UCL remedies include "such orders or judgments . . . as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of unfair competition." (Bus. & Prof. Code, § 17203.) This provision constitutes "a grant of broad equitable power." (*Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 180.)

Precision seeks the following equitable remedy: "Precision needs a UCL judgment to make sure it has priority to the equity in the properties over liens filed by the Plyams and their counsel. No other cause of action supports the lis pendens." Precision's argument assumes the UCL judgment would relate back to the lis pendens

27

recorded on the Plyams' property.[20] (Code Civ. Proc., § 405 et seq.)  We need not decide whether Precision's lien priority argument is correct because the UCL cause of action is not a real property claim affecting title or right of possession for the purposes of the lis pendens statute.  (See Code Civ. Proc., § 405.4.)

"[A] lis pendens is a recorded document giving constructive notice that an action has been filed affecting title or right to possession of the real property described in the notice." (*BGJ Associates v. Superior Court* (1999) 75 Cal.App.4th 952, 966; see also *Kirkeby v. Superior Court* (2004) 33 Cal.4th 642, 647.)  Here, the UCL cause of action is based on the diversion of Precision funds to acquire and improve the Plyams' property, not the right to title or right to possession of that property.  Courts have eschewed the approach Precision advocates here, that is, transforming a lis pendens into a money-collection remedy.  (*Lewis v. Superior Court* (1994) 30 Cal.App.4th 1850, 1864.)

Alternatively, Precision argues the UCL is an appropriate cause of action to obtain the equitable remedy sought here to recover Precision's money that the Plyams put "in their home, vacation homes and rentals."  Citing *Kirkeby v. Superior Court*, *supra*, 33 Cal.4th 642, Precision contends that although no court in a published decision has discussed whether a UCL plaintiff may avail itself of "lis pendens relief," that relief is available in Uniform Fraudulent Transfer Act (UFTA) actions.  (Civ. Code, § 3439 et seq.)  In *Kirkeby*, the Supreme Court held that a fraudulent conveyance action seeking avoidance of transfer affects title to or the right to possession of real property, and thus it is a real property claim for the purposes of the lis pendens statutes.  (*Kirkeby v. Superior Court*, at p. 649.)  The *Kirkeby* court, however, distinguished a fraudulent conveyance from a situation such as the one presented here, in which a party alleged that its money was wrongfully taken and used to buy real property.  (*Id*. at p. 650; see also *Lewis v. Superior Court*, *supra*, 30 Cal.App.4th at p. 1865.)  Here, the claim is that the Plyams' wrongfully took Precision funds and used the money to buy and improve their property.

---

[20]    Precision seeks judicial notice of certain documents to show that the principal assets to be collected are in jeopardy of being lost to tax lien foreclosure.  We decline this request as these documents are not relevant to the issues on appeal.

There is no claim that affects "title to, or the right to possession of, specific real property" as required by Code of Civil Procedure section 405.4.[21] Thus, Precision's UCL claim would not support lis pendens relief as an equitable remedy. Accordingly, the equitable remedy Precision seeks is not, as a matter of law, available in this case. In light of our conclusion, we do not address Precision's remaining arguments premised on a new trial.

---

[21] During the pendency of this appeal, Precision filed a petition for writ of mandate challenging the trial court's order granting a motion to expunge a lis pendens recorded on the Plyams' personal residence. We issued an order to the trial court directing that expungement of the lis pendens is stayed pending further order of this court. Although we conclude that Precision is not entitled to lis pendens relief as an equitable remedy, we do not discharge the stay of the trial court proceedings currently in effect. (See *Behniwal v. Superior Court* (2005) 133 Cal.App.4th 1048, 1050.) The decision on the petition for writ of mandate is deferred pending finality of the appeal.

DISPOSITION

The judgment is affirmed.  No costs are awarded on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ALDRICH, J.


We concur:


KLEIN, P. J.


KITCHING, J.

30